OPINION
{¶ 1} Laqwan Scandrick was convicted by a jury in the Clark County Court of Common Pleas of aggravated murder with a firearm specification, two counts of felony murder with firearm specifications, and tampering with evidence. The felony murder convictions were merged with the conviction for aggravated murder. The trial court sentenced Scandrick to life in *Page 2 
prison without parole for the aggravated murder, to one year for the firearm specification, and to five years in prison for tampering with evidence, to be served consecutively to each other and to a term of imprisonment imposed in another case. Scandrick appeals, arguing that his convictions were against the weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.
 I {¶ 2} The charges in this case arose out of the shooting death of Timothy O'Connor at his home at approximately 9:00 p.m. on Friday, January 6, 2006. The state's evidence at trial established the following facts.
 {¶ 3} Toya Crowley, the State's sole eyewitness, had known Timothy O'Connor for four or five years, and she regularly went to his home between 8:00 and 9:00 on Friday evenings to smoke crack cocaine while naked and to talk. Crowley brought the crack cocaine — and occasionally female friends — with her. Crowley considered O'Connor to be her friend. Crowley acknowledged that she was a crack addict.
 {¶ 4} In January 2006, Scandrick was residing at 441 ½ East High Street with his sister, LaToya Scandrick, and LaToya's boyfriend, John Crowley, Toya's brother. Crowley was living nearby with Scandrick's mother, Angela, with whom she had a relationship. Scandrick was a crack cocaine dealer, and Crowley made money to buy crack cocaine by selling crack cocaine.
 {¶ 5} On the night of the murder, Crowley went to the High Street residence to see her daughter, who was there. Scandrick was also at the house when she arrived. Crowley testified that she had smoked all of Scandrick's crack cocaine, and she decided to take him with her to *Page 3 
O'Connor's home to get him more money. Scandrick borrowed a car in exchange for crack, and they drove to O'Connor's house at 713 Cypress Avenue. After they arrived, Scandrick sold O'Connor $100 of crack cocaine for $40. Crowley observed that O'Connor had $60 in his wallet; O'Connor paid Scandrick $40 and returned the rest to his wallet. O'Connor tried the crack cocaine, and Crowley described the mood as "good."
 {¶ 6} Soon thereafter, Crowley decided to go to the car to get her purse. She testified that she felt "the door shove up on me" and she heard a gunshot. Crowley turned around and saw O'Connor reaching out. Crowley then saw Scandrick shoot O'Connor in the chest with a long, silver, white-handled revolver. Scandrick said, "Let's go, T" and he ran out of the house. Crowley watched O'Connor for several minutes, believing he was dead, and then she walked back to her brother's home. The car that Scandrick had driven was outside the High Street residence.
 {¶ 7} Before entering the house, Crowley saw and retrieved O'Connor's wallet from the vehicle. No cash was in the wallet. Crowley entered the apartment of her brother's downstairs neighbor, and she heard Scandrick "talking about how much he's a gangster and all that." Scandrick told her to go to the bank to get money with O'Connor's ATM card. At approximately 10:00 p.m., Crowley went to the nearby Key Bank and "pushed a bunch of buttons." She reported to Scandrick that she couldn't get any money.
 {¶ 8} Crowley left her brother's home and went to her mother's house to return her mother's car and to change clothes. Shortly before 3:00 a.m. on January 7, Crowley went to a gas station and made purchases with O'Connor's Visa card in exchange for cash. Crowley got a ride from her cousin so she could purchase more crack cocaine. Afterward, Crowley *Page 4 
unsuccessfully attempted to get high. Crowley threw O'Connor's wallet into a sewer by a bowling alley near her mother's residence.
 {¶ 9} At approximately 11:30 p.m. on January 6, O'Connor's teenaged daughter discovered O'Connor's body after being dropped off at the house by her mother's boyfriend, Tom Morris. Morris asked a neighbor to call the police. Because there were no signs of blood or injury, the police initially believed that the death could have been caused by an overdose or natural causes. A subsequent autopsy revealed that O'Connor had died from two .22 caliber bullet wounds, one to the left armpit and one to the lower left chest.
 {¶ 10} A few weeks after O'Connor's death, Crowley went to a rehab center in Minnesota.
 {¶ 11} Beginning in February 2006, Scandrick's personality began to change. Scandrick's then-girlfriend, Brooke Cosby, testified that Scandrick was depressed, started smoking cigarettes, had trouble sleeping, and was violent and argumentative. Scandrick told her that he kept seeing a Caucasian male sitting in the rocking chair or sitting on the windowsill in the room, smoking a cigarette.
 {¶ 12} In March 2006, Scandrick got into a physical argument with Cosby and threatened her, stating, "I will kill you. I've done it before, and I'll do it to you." When Scandrick apologized the next day, Scandrick told Cosby that he and Crowley had gone to someone's house to rob him and that "it went wrong"and "there was nothing there." Scandrick related to Cosby that the man was trying to protect himself and lunged at him, and Scandrick shot him. When Cosby asked who the man was, Scandrick responded that it was "that white guy that was in the paper around January." Scandrick also told Cosby that he had thrown away *Page 5 
the gun in a drain by his house.
 {¶ 13} After Scandrick's arrest, he later complained to Cosby that "Toya Crowley is in Minnesota running her mouth about you know what ***." Cosby testified that the "[o]nly thing that [Scandrick] and Toya Crowley have in common [was] the murder."
 {¶ 14} In April 2006, detectives from the Springfield Police Department interviewed Crowley and Cosby. Both ultimately told detectives that Scandrick had shot and killed O'Connor.
 {¶ 15} In May 2006, Scandrick was indicted for aggravated murder with a firearm specification, two counts of felony murder with firearm specifications, and tampering with evidence. As stated above, he was found guilty of all charges. Scandrick was convicted of aggravated murder with the firearm specification and tampering with evidence, and he was sentenced accordingly.
 II {¶ 16} In his sole assignment of error, Scandrick claims that his convictions were against the manifest weight of the evidence.
 {¶ 17} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide *Page 6 
"whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 18} Scandrick claims that the jury "lost its way" when it credited the testimony of Crowley and Cosby. Scandrick argues that Crowley had repeatedly lied to the police about the events of January 6-7, 2006, that she was addicted to crack, and that she had strong reasons for placing the blame on Scandrick. As for Cosby, Scandrick asserts that Cosby was a scorned ex-girlfriend who had been threatened and beaten up by him and that she would "do everything she can to keep Mr. Scandrick away from her and locked up in jail." Finally, Scandrick claims that there is no forensic evidence placing him inside O'Connor's apartment.
 {¶ 19} As noted by Scandrick, the jury was presented evidence that both Crowley and Cosby initially had been untruthful to the police and had motives to accuse Scandrick. Crowley acknowledged that she had been convicted of forgery and she was addicted to crack cocaine. When Crowley spoke with Detective Dewine in Minnesota, she initially denied any knowledge that O'Connor had been shot, that she had seen O'Connor the weekend of January 6, 2006, or that she or Scandrick had been at O'Connor's house. She told Dewine that she would have said something *Page 7 
about O'Connor's death if she had known about it. Crowley admitted at trial that she had told Dewine that she had found O'Connor's ATM card in her coat pocket and that he had given her his Visa card. Crowley admitted to lying to Dewine about walking away from the gas station after using O'Connor's credit card. Crowley further testified on cross-examination that Dewine had suggested to her that someone had gone into O'Connor's house, killed him, and given her the credit cards. Afterwards, Crowley told Dewine, "I was there, and Laqwan shot him." Finally, although Crowley testified on direct examination that she knew O'Connor was dead when she left his house, she called his cellphone later that night, asking him to call her.
 {¶ 20} Cosby dated Scandrick from September 2005 until March 2006. Cosby testified that Scandrick had threatened to kill her in March 2006 and that she had gotten a restraining order against him. Scandrick was subsequently charged with burglary of her residence and assaulting her. Cosby informed the police about Scandrick's involvement in O'Connor's death prior to Scandrick's trial on the burglary charges. Cosby admitted that she initially told the police that Scandrick had denied shooting O'Connor. Cosby testified that she told the police that Scandrick had shot O'Connor after the police told her that she could get in trouble for withholding evidence. Cosby acknowledged that she had wanted to keep Scandrick in jail.
 {¶ 21} Although the record indicates that Crowley and Cosby were not forthcoming with the police and had motives to lie about Scandrick's involvement, the jury also had a reasonable basis to believe their testimony that Scandrick had shot O'Connor. Crowley testified that O'Connor had reached out prior to the second gunshot, which was consistent with the coroner's testimony that O'Connor had his arm *Page 8 
raised when he was shot near his left armpit. This testimony supported Crowley's assertion that she had witnessed the second gunshot. Moreover, although Crowley's and Cosby's versions of the events of January 6, 2006 were not identical, they both testified that Crowley and Scandrick had gone to O'Connor's home where Scandrick had shot O'Connor. Crowley and Cosby stated that they did not know each other and had met only briefly. Both women denied having any conversations after January 6, 2006. Thus, the jury could reasonably conclude that Crowley's version of events was independently supported by Cosby's testimony. Moreover, the jury could also reasonably conclude that Crowley's testimony was substantiated by Scandrick's letter to Cosby, which complained about Crowley "running her mouth." Although the jury could have chosen not to believe Crowley and Cosby, we give substantial deference to the jury's decision to credit their testimony.
 {¶ 22} Scandrick also claims that the police failed to conduct DNA tests on glasses and cigarette butts from O'Connor's home and on the baggie of crack cocaine found in O'Connor's pocket to establish Scandrick's presence in the apartment. In our view, the state had ample evidence to support Scandrick's conviction without DNA evidence. Moreover, Scandrick could have been present at O'Connor's house without leaving detectable DNA evidence. The absence of scientific evidence placing Scandrick in O'Connor's home does not render his conviction against the manifest weight of the evidence.
 {¶ 23} The assignment of error is overruled.
 III {¶ 24} Having overruled the assignment of error, the judgment of the trial court will be affirmed.
FAIN, J. and DONOVAN, J., concur.
Copies mailed to:
Amy M. Smith
Brett Anthony Rinehart
 Hon. Douglas M. Rastatter *Page 1